**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| WILMINGTON TRUST, NATIONAL ASSOCIATION, solely in its capacity as successor Indenture Trustee for the 10.75% Notes due 2016,<br><br>     Plaintiff,<br><br>     v.<br><br>CAESARS ENTERTAINMENT CORPORATION,<br><br>     Defendant. | CIVIL ACTION NO.:_____<br><br>COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES<br><br>DEMAND FOR TRIAL BY JURY |

Wilmington Trust, National Association ("Wilmington Trust"), as Successor Indenture Trustee (the "10.75% Notes Trustee" or "Plaintiff") for the 10.75% Senior Unsecured Notes due 2016 (the "10.75% Notes") issued by Caesars Entertainment Operating Company, Inc. ("CEOC"), and guaranteed by certain wholly-owned domestic subsidiaries of CEOC (the "Subsidiary Guarantors"), under that certain indenture dated February 1, 2008 (the "Indenture"), by and through its undersigned counsel, hereby brings this complaint (the "Complaint") against Caesars Entertainment Corporation ("Defendant" or "CEC" and, together with its direct and indirect subsidiaries, "Caesars") to enforce CEC's guarantee of CEOC's debt obligations with respect to the 10.75% Notes (the "Parent Guarantee"), and in support thereof respectfully alleges as follows:

## NATURE OF THE ACTION

1.  This action concerns CEC's reported attempts to avoid its written guarantee of the repayment of over $51 million of unpaid interest in respect of the 10.75% Notes. Plaintiff, for the benefit of holders of the 10.75% Notes (the "10.75% Noteholders"), seeks various forms of relief to recover that unpaid interest. Primarily, Plaintiff seeks to establish that CEC's actions in

purporting to release itself from any obligations under its Parent Guarantee are void for violations of both the Trust Indenture Act of 1939, 15 U.S.C. §§ 77aaa to 77bbbb (the "TIA") and the Indenture. Plaintiff further seeks a money judgment against CEC in an amount equal to the $51,447,565.00 of outstanding interest that is due and payable but remains unpaid as of the date hereof under the Indenture (the "Missed Interest Payments").

2.      Defendant CEC is the parent holding company of CEOC, the issuer of the 10.75% Notes. As of the date hereof, the 10.75% Notes remain outstanding in the principal amount of approximately $479 million plus interest, fees, and other charges due under the Indenture. Under that Indenture, and as a material payment term thereof, CEC unconditionally and irrevocably guaranteed payment of all principal and interest owing on the 10.75% Notes as and when due. See Indenture § 11.01(a) (Exhibit 1).

3.      As discussed in greater detail herein, during the past several years, CEC used its position as CEOC's controlling shareholder to cause CEOC to transfer many of its most valuable assets to affiliated entities controlled by CEC and its shareholder sponsors (the "Distressed Transfers"). Upon information and belief, those Distressed Transfers have rendered CEOC insolvent and unable to pay principal and interest in respect of the 10.75% Notes as and when due. From an economic standpoint, because the Indenture remained valid and in effect, the 10.75% Notes Trustee had direct claims for principal and interest against both CEOC, as issuer transferor, and CEC, as guarantor transferee. The 10.75% Noteholders, therefore, were not disadvantaged by the Distressed Transfers between co-obligors on the debt under the Indenture.

4.      Directly following the closing of the last of the Distressed Transfers, however, CEC purported to release its guarantee of CEOC's funded debt obligations, including its Parent

Guarantee of the 10.75% Notes.  That purported release had the effect of leaving the 10.75% Noteholders without recourse to payment from CEC, the transferee, then in control of CEOC's former assets.  Indeed, in other litigation against CEC pending in this Court, CEC has continued to assert that all of its guarantees of CEOC's funded debt obligations have been released and that it has no obligation to pay any of CEOC's debts at this time.  See, e.g., BOKF Action (as defined below), *Memorandum of Law of Caesars Entertainment Corporation In Opposition To BOKF, N.A.'s Motion for Partial Summary Judgment* (July 24, 2015) [Dkt. No. 44], at 8-11. Specifically, with respect to its Parent Guarantee of the 10.75% Notes, CEC has asserted that the Parent Guarantee was released in conjunction with CEC's sale of 68.1 shares of CEOC equity in May 2014 (or 5% of all CEOC's shares).  Relying on this sale, on May 6, 2014, CEC first publicly announced its view that none of its obligations under the Parent Guarantee were in effect.  At all times since, CEC has not withdrawn its disavowal and has thus been in material breach of the Indenture.

5.      CEC's breach of the Indenture now has a direct monetary impact on the 10.75% Notes Trustee.  The reverse form of note attached to the Indenture makes clear that the Missed Interest Payments were due and payable on February 1 and August 1, 2015.  See Form Of Reverse Side Of Initial Cash Pay Note for the 10.75% Senior Cash Pay Notes Due 2016 (Exhibit 2).  Those amounts have not been paid by either CEOC or CEC.  As a guarantor of payment, not collection, CEC is directly obligated to make the Missed Interest Payments to the 10.75% Notes Trustee.  See Indenture §§ 11.01(a), 11.01(d).

6.      Together, the Distressed Transfers and the purported release of the Parent Guarantee constitute an out-of-court restructuring or reorganization of CEC's and CEOC's debt

obligations with the overall effect of impairing the right of the 10.75% Notes Trustee to receive payment of principal and interest on the 10.75% Notes as and when due.

7.     Neither the 10.75% Notes Trustee, nor any 10.75% Noteholder in its capacity as such, has ever consented to any out-of-court restructuring of principal or interest due under the Indenture (including the Parent Guarantee therein) or the proposed reorganization scheme.  As a result, the out-of-court restructuring or reorganization scheme and its purported release of the Parent Guarantee constitute a violation of the TIA, rendering the purported Parent Guarantee strip null and void.

8.     Independent of the TIA–related claims, and as alleged in greater detail herein, the terms of the Indenture did not, in fact, permit CEC's release of the Parent Guarantee pursuant to the Five Percent Sale (as defined below).  As set forth below, CEC's purported bases for releasing itself had no business rationale, served only as a pretense to support CEC's disavowal of the Parent Guarantee, and were not sufficient to release the Parent Guarantee under the express terms of the Indenture.  Having failed to disclaim that ineffective release and disavowal within the ten business days provided for in the Indenture, CEC materially breached the Indenture.  Regardless of any supervening event, including any subsequent purported releases of the Parent Guarantee, CEC has remained in material breach of the Indenture since May 16, 2014.

## THE PARTIES

9.     Plaintiff is a national banking association with a principal place of business at Rodney Square North, 1100 North Market Street Wilmington, Delaware 19890.  Plaintiff is the successor indenture trustee under the Indenture dated as of February 1, 2008 among CEOC, as issuer, CEC as guarantor, and U.S. Bank National Association, as trustee.  On January 23, 2015, Plaintiff was appointed successor trustee to U.S. Bank National Association pursuant to the

terms of the Indenture.  Plaintiff currently serves as the 10.75% Notes Trustee under the Indenture.

10.     Defendant CEC (formerly known as Harrah's Entertainment, Inc.) is a Delaware corporation with its principal place of business at One Caesars Palace Drive, Las Vegas, Nevada 89109.  CEC and CEOC, together with their affiliates, provide casino entertainment services, operating primarily under the Caesars, Harrah's, and Horseshoe brand names.  CEC is publicly traded and is the world's most geographically diversified casino-entertainment provider.  CEC, through its economic interests in CEOC, Caesars Entertainment Resort Properties, LLC ("CERP"), and Caesars Growth Partners, LLC ("CGP"), owns, operates, or manages 50 gaming and resort properties in 14 states and five countries, covering 3 million square feet of gaming space, 39,000 hotel rooms, 45 million customer loyalty program participants, and 68,000 employees.

## JURISDICTION & VENUE

11.     This Court has subject matter jurisdiction pursuant to Section 322(b) of the TIA, 15 U.S.C. § 77vvv(b), Section 22(a) of the Securities Act of 1933, 15 U.S.C. § 77v(a), and 28 U.S.C. §§ 1331, 1367, and 2201.  This controversy arises under federal law, involves claims herein so related to the 10.75% Notes Trustee's federal claims that they form part of the same case or controversy, and the 10.75% Notes Trustee seeks a declaration of the rights and other legal relations of the 10.75% Notes Trustee and the 10.75% Noteholders, whether or not further relief is or could be sought.

12.     This Court has personal jurisdiction over CEC under New York's long arm jurisdiction statute, N.Y.C.P.L.R. § 302(a), because it has, at least, minimum contacts with the State of New York.  Among other things, CEC transacts business within the State, regularly does or solicits business, or engages in other persistent courses of conduct in the State, expects or

should reasonably expect its acts to have consequences in the State, and/or derives substantial revenue from interstate or international commerce.

13.     Venue is proper in this District pursuant to Section 322(b) of the TIA, 15 U.S.C. § 77vvv(b), Section 22(a) of the Securities Act of 1933, 15 U.S.C. § 77v(a), and 28 U.S.C. §§ 1391(b) and (c).  Among other things, CEC is found or transacts business in this District, the offer or sale of debt at issue took place at least in part in this District, and/or a substantial part of the events giving rise to the violations of law complained of herein occurred at least in part in this District.

14.     Section 13.09 of the Indenture provides that the provisions of the Indenture and securities "shall be governed by, and construed in accordance with, the laws of the State of New York . . . ." Indenture § 13.09.

15.     CEC is a party to several actions pending in this District, which cases are related to this Complaint and raise similar issues regarding CEC's conduct, including: (i) the MeehanCombs Action; (ii) the BOKF Action; and (iii) the UMB Action (each as defined below).

## FACTUAL ALLEGATIONS

**Background on CEC and CEOC Obligations**

16.     On January 28, 2008, CEC was acquired by affiliates of Apollo Global Management, LLC ("Apollo") and TPG Capital, LP ("TPG" and, together with Apollo, the "Sponsors") in an all-cash transaction (the "LBO"), valued at approximately $30.7 billion.  As a result of this transaction, the issued and outstanding shares of non-voting common stock and non-voting preferred stock of CEC became owned by entities affiliated with the Sponsors and certain co-investors and members of management, and the issued and outstanding shares of voting common stock of CEC became owned by Hamlet Holdings LLC, which is itself owned by certain individuals affiliated with the Sponsors.  See CEC Current Report (Form 10-K) (filed

Mar. 9, 2010), at 3.  The Sponsors and other investors contributed approximately $6.1 billion, and the remainder was funded through the issuance of approximately $24 billion in debt.  See In re Caesars Entm't Operating Co., Inc., No. 15-01145 (ABG) (Bankr. N.D. Ill.), *Memorandum in Support of Chapter 11 Petitions* (Jan. 15, 2015) [Dkt. No. 4] (the "Mem. in Support"), at 4.

17.     Currently, CEOC has the following outstanding funded debt obligations, totaling approximately $18.4 billion in principal amount:

- four tranches of first lien bank debt totaling approximately $5.35 billion (the "First Lien Bank Debt");

- three series of outstanding first lien notes totaling approximately $6.35 billion (the "First Lien Notes");

- three series of outstanding second lien notes totaling approximately $5.24 billion (the "Second Lien Notes" and, together with the First Lien Notes, the "Secured Notes");

- the 10.75% Notes, totaling approximately $479 million; and

- two series of senior unsecured notes totaling approximately $530 million (the "Legacy Notes").

**The 10.75% Notes**

18.     In connection with the LBO, on February 1, 2008, CEOC issued $4,932,417,000 aggregate principal amount of 10.75% Notes and $1,402,583,000 aggregate principal amount of 10.75%/11.5% senior toggle notes, which mature on February 1, 2016 and February 1, 2018, respectively, pursuant to the Indenture, between CEOC, the Subsidiary Guarantors party thereto, and U.S. Bank National Association, as original trustee.  The 10.75% Notes are guaranteed by CEC and each Subsidiary Guarantor.

19.     Pursuant to Section 11.01(a) of the Indenture, CEC "jointly and severally, irrevocably and unconditionally" guaranteed CEOC's obligations under the Indenture.  Indenture § 11.01(a).  Further, Section 11.01(g) of the Indenture provides that the Parent Guarantee "shall

remain in full force and effect until payment in full of all the Guaranteed Obligations." Id. §
11.01(g).

**Relevant Provisions From Indenture**

20.     The Indenture provides certain essential protections to the 10.75% Noteholders.
One such provision—mandated by Section 316(b) of the TIA, 15 U.S.C. § 77ppp(b)—is the
unconditional right of noteholders to receive payment of principal and interest.  Section 316(b)
of the TIA states:

> Notwithstanding any other provision of the indenture to be qualified, *the right of
> any holder of any indenture security to receive payment of the principal of and
> interest on such indenture security*, on or after the respective due dates expressed
> in such indenture security, *or to institute suit for the enforcement of any such
> payment on or after such respective dates, shall not be impaired or affected
> without the consent of such holder . . . .*

15 U.S.C. § 77ppp(b) (emphasis added).   The protections of Section 316(b) of the TIA are
incorporated into Section 6.07 of the Indenture:

> Notwithstanding any other provision of this Indenture, *the right of any holder to
> receive payment of principal of and interest on the Notes held by such holder*, on
> or after the respective due dates expressed or provided for in the Notes, *or to
> bring suit for the enforcement of any such payment on or after such respective
> dates, shall not be impaired or affected without the consent of such  holder.*

Indenture § 6.07 (emphasis added).

21.     Section 6.07 of the Indenture, therefore, provides an unconditional right to receive
principal and interest on the 10.75% Notes, which right shall not be impaired without the consent
of each holder.

22.     To the extent the Indenture and the TIA conflict, the Indenture provides that the
relevant provisions of the TIA, including Section 316, control:

> If and to the extent that any provision of this Indenture limits, qualifies or
> conflicts with the duties imposed by, or with another provision (an 'incorporated

provision') included in this Indenture by operation of, Sections 310 to 318 of the TIA, inclusive, such imposed duties or incorporated provision shall control.

Id. § 13.01.

23.     Together, Sections 6.07 and 13.01 of the Indenture ensure that "a company cannot – outside of bankruptcy – alter its obligation to pay bonds without the consent of each bondholder."  MeehanCombs Action, *Opinion and Order* (Jan. 15, 2015) [Dkt. No. 28], at 10-11 (Scheindlin, J.).   Rather, "if, in taking actions allowed under the release provision of the Indenture, CEC violated noteholders' rights to payment under section 316(b), then the release was invalid as a matter of law."  BOKF Action, *Opinion and Order* (Aug. 27, 2015) [Dkt. No. 54] (the "TIA Decision"), at 22 (Scheindlin, J.).

24.     The Indenture provides that CEC is a primary obligor that has "jointly and severally, irrevocably and unconditionally" guaranteed the payment of interest under the Indenture when due and payable:

> Each Note Guarantor hereby jointly and severally, irrevocably and unconditionally guarantees on a unsecured senior basis, as a primary obligor and not merely as a surety . . . the full and punctual payment when due, whether at Stated Maturity, by acceleration, by redemption or otherwise, of all obligations of the Issuer under this Indenture (including obligations to the Trustee) and the Notes, whether for payment of principal of, premium, if any, or interest on in respect of the Notes. . . .

Indenture § 11.01(a).

25.     Section 11.01(h) of the Indenture contemplates that "each Note Guarantor hereby promises to and shall . . . forthwith pay . . . an amount equal to the sum of (i) the unpaid principal amount of such Guaranteed Obligations, (ii) accrued and unpaid interest on such Guaranteed Obligations . . . and (iii) all other monetary obligations of the Issuer to the holders and the Trustee."  Id. § 11.01(h).

26.     The Indenture clarifies that this guarantee is a guarantee of payment, not collection, meaning that, as set forth in 11.01(d), payment is owing when due:

> Each Note Guarantor further agrees that its Note Guarantee herein constitutes a guarantee of payment, performance and compliance when due (and not a guarantee of collection) and waives any right to require that any resort be had by any holder or the Trustee to any security held for payment of the Guaranteed Obligations.

Id. § 11.01(d).

27.     The Indenture establishes that it is an Event of Default if CEC denies or disaffirms the Parent Guarantee, and this remains uncured for 10 days:

> An 'Event of Default' occurs with respect to a series of Notes if: . . . [T]he Parent Note Guarantor . . . denies or disaffirms its obligations under this Indenture or any Note Guarantee with respect to such series of Notes and such Default continues for 10 days.

Id. § 6.01(h).  As discussed herein, CEC denied and disaffirmed the Parent Guarantee pursuant to the May Announcement (as defined below).  Accordingly, CEC has violated Section 6.01(h) of the Indenture.

28.     Further, the Indenture provides that it is an Event of Default if there is a default in any payment of interest when the same becomes due and payable and this remains uncured for 30 days:

> An 'Event of Default' occurs with respect to a series of Notes if: . . . [T]here is a default in any payment of interest (including any additional interest) on any Note of such series when the same becomes due and payable, and such default continues for a period of 30 days.

Id. § 6.01(a).  Interest payments were due and payable on February 1 and August 1, 2015 and, to date, those interest payments have not been made.  See Form Of Reverse Side Of Initial Cash Pay Note for the 10.75% Senior Cash Pay Notes Due 2016.

29.     The Indenture does not require the 10.75% Notes Trustee to issue a demand to CEC for payment prior to bringing this action, given that CEC expressly waived any right to assert that its payment obligations under the Indenture were subject to various pre-conditions:

> (b) Each Note Guarantor waives presentation to, demand of payment from and protest to the Issuer of any of the Guaranteed Obligations and also waives notice of protest for nonpayment. Each Note Guarantor waives notice of any default under the Notes or the Guaranteed Obligations. The obligations of each Note Guarantor hereunder shall not be affected by (i) *the failure of any holder or the Trustee to assert any claim or demand or to enforce any right or remedy against the Issuer or any other Person under this Indenture, the Notes or any other agreement or otherwise*; (ii) any extension or renewal of this Indenture, the Notes or any other agreement; (iii) any rescission, waiver, amendment or modification of any of the terms or provisions of this Indenture, the Notes or any other agreement; (iv) the release of any security held by any holder or the Trustee for the Guaranteed Obligations or any Note Guarantor; (v) the failure of any holder or Trustee to exercise any right or remedy against any other guarantor of the Guaranteed Obligations; or (vi) any change in the ownership of such Note Guarantor, except as provided in Section 11.02(b).

> (c) Each Note Guarantor hereby waives any right to which it may be entitled to have its obligations hereunder divided among the Note Guarantors, such that such Note Guarantor's obligations would be less than the full amount claimed. Each Note Guarantor hereby waives any right to which it may be entitled to have the assets of the Issuer first be used and depleted as payment of the Issuer's or such Note Guarantor's obligations hereunder prior to any amounts being claimed from or paid by such Note Guarantor hereunder. Each Note Guarantor hereby waives any right to which it may be entitled to require that the Issuer be sued prior to an action being initiated against such Note Guarantor.

Indenture §§ 11.01(b)-(c) (emphasis added).[1]

---

[1] In any event, demand for payment from CEC would be futile, as CEC already has repeatedly disavowed the guarantee and opted to litigate the question of its liability before this Court. See, e.g., MeehanCombs Action; BOKF Action; UMB Action. For this reason, CEC, in responding to UMB Bank N.A.'s ("UMB") summary judgment motion, failed to raise and did not contest UMB's failure to seek demand prior to commencement of its complaint. See UMB Action, *Complaint* (June 15, 2015) [Dkt. No. 1], at 20 ("[S]uch demand would clearly be futile in this case, as CEC has repeatedly disclaimed its Guarantee liability in its publicly disclosed securities filings."); UMB Action, *Memorandum of Law of Caesars Entertainment Corporation in Opposition to UMB Bank, N.A.'s Motion for Partial Summary Judgment* (July 24, 2015) [Dkt. No. 46].

**Caesars' Restructuring and/or Reorganization Scheme**

30.     Immediately following the LBO, CEOC was the main operating subsidiary of CEC and owned and operated five casino resorts on the Las Vegas strip, five casinos in Atlantic City, and 17 regional casinos across the United States.   CEOC also managed 20 other casino properties and owned an online gaming business, the rights to the World Series of Poker, and all of the intellectual property and data comprising Caesars' revolutionary customer loyalty program, the Total Rewards Program.   The LBO, which saddled CEOC with substantial new debt obligations, occurred at the precipice of the financial crisis that began in 2008.   This left CEOC over-levered and facing substantial challenges, including significant declines in revenue (particularly from CEOC's regional casinos).

31.     As a result, beginning at least as early as March 2014, CEOC was likely insolvent.   At that time, CEC publicly acknowledged that CEOC's cash flow from operations would be insufficient to repay CEOC's indebtedness in the long term.   See CEC Current Report (Form 10-K) (filed Mar. 17, 2014), at 46 ("We do not expect that cash flow from operations will be sufficient to repay CEOC's indebtedness in the long-term and we will have to ultimately seek a restructuring, amendment or refinancing of our debt, or if necessary, pursue additional debt or equity offerings.").

32.     Upon information and belief, to preserve the value of its equity investment in CEOC (which appeared hopelessly burdened with LBO debt), CEC, through its control of CEOC, caused CEOC to undertake a systematic process of diverting value away from CEOC's LBO creditors.   This process was accomplished in two steps: (i) certain of CEOC's most valuable assets were extracted from CEOC and funneled into other CEC subsidiaries not burdened by LBO debt (i.e., the Distressed Transfers) and (ii) the Parent Guarantee CEC

provided in favor of CEOC's debt was stripped.  This two-step strategy, if effective, could ensure that CEC and the Sponsors would retain their equity in CEOC's most valuable assets (because they would be safely harbored at other CEC subsidiaries free of the Parent Guarantee), while at the same time insulate CEC from judicial scrutiny of its out-of-court restructuring or reorganization.

33.    The Distressed Transfers included the following transfers of material assets from CEOC and its subsidiaries to CEC subsidiaries:

- CIE Transaction.  CEOC transferred its interest in certain intellectual property to Caesars Interactive Entertainment ("CIE") in exchange for equity in CIE. Subsequently, CEC forced CEOC to transfer its interest in CIE to CEC which ultimately transferred the interest to CGP.

- CERP Transaction.  The Octavius Tower at Caesars Palace ("Octavius") and Project LINQ were transferred from CEOC subsidiaries to CERP for less than reasonably equivalent value.

- CGP Transaction.  Planet Hollywood Resort and Casino ("Planet Hollywood"), the Horseshoe Casino Baltimore ("Horseshoe Baltimore"), and 50% of the management fee stream for these properties were transferred from CEOC subsidiaries to CGP for less than reasonably equivalent value.

- Four Properties Transactions.  The Linq Hotel & Casino (formerly known as The Quad Resort & Casino) (the "Linq Hotel"), The Cromwell, Bally's Las Vegas Hotel and Casino ("Bally's Las Vegas"), and Harrah's New Orleans Hotel and Casino ("Harrah's New Orleans") were transferred from CEOC subsidiaries to CGP for less than reasonably equivalent value.

- CES Transaction.  CEOC granted to Caesars Entertainment Services ("CES") (an entity owned jointly among CEC, CEOC, and Caesars Growth Properties Holdings, LLC) an exclusive and irrevocable license in highly valuable intellectual property, including the Total Rewards Program.

**CIE Transaction**

34.    CIE was formed in May 2009 as an indirect subsidiary of CEOC with the purpose of developing certain Caesars brands, including its online gaming platform and the World Series of Poker brand.  CEOC transferred to CIE the World Series of Poker rights and related

intellectual property in exchange for equity interests valued at $15 million, though CEOC retained the right to use the intellectual property pursuant to a perpetual, royalty-free license. See Mem. in Support, at 6.

35.     In 2011 (i) CIE purchased from CEOC the exclusive right to host World Series of Poker tournaments for $20.5 million in cash and (ii) CEC subsequently caused CEOC to transfer to CEC the subsidiary holding the CIE equity interests.   Finally, in October 2013, CEC transferred the subsidiary holding the CIE equity interests to CGP as part of the CGP Transaction (described below).   See id.   CIE's stated value in October 2013 was $750 million.

**CERP Transaction**

36.     In August 2013, CEC and the Sponsors formed CERP.   On October 11, 2013, the equity interests in Octavius and Project LINQ, marquee properties of the Caesars enterprise, were transferred from CEOC to CERP.   Octavius is the newest of the six hotel towers that comprise Caesars Palace.   Octavius is a 23-story high-end luxury complex that features 662 guest rooms, 60 suites, and six luxury villas.   CEOC spent approximately $860 million to construct Octavius and intended it to appeal to Caesars Palace VIP customers and other high net worth guests.   See CEC Current Report (Form 10-K) (filed Mar. 15, 2012), at 33.   Project LINQ is "a $550 million outdoor retail, dining and entertainment district on the east side of the Las Vegas Strip between the Flamingo Las Vegas and The Quad Resort and Casino" and includes the world's largest observation wheel, "The High Roller."   CEC Current Report (Form 10-K) (filed Mar. 17, 2014), at 37.   Project LINQ is across the street from Caesars Palace and is positioned in the midst of other Caesars properties formerly owned by CEOC.   The first phase of Project LINQ opened in December 2013.   See id.

37.     In exchange for the ownership interests in Octavius and Project LINQ, CERP provided to CEOC $80.7 million in cash and $53 million in CEOC notes for retirement and assumed $450 million in debt.  This provided a total value of less than $600 million for both properties.  See Mem. in Support, at 32-33.

**CGP Transaction**

38.     CGP was formed on October 21, 2013 as a joint venture between subsidiaries of CEC and Caesars Acquisition Company ("CAC") to acquire assets from CEOC and CEC.  As stated by CEC, "CAC was formed to directly own 100% of the voting membership units in CGP LLC. CGP LLC was formed for the purpose of acquiring certain businesses and assets of Caesars Entertainment."  CEC Current Report (Form 10-K) (filed Mar. 17, 2014), at 7.  All of the non-voting units of CGP are owned by CEC or its subsidiaries.

39.     The CGP joint venture was formed through several transactions including: (i) a rights offering of CAC common stock; (ii) the exercise of subscription rights by the Sponsors to purchase $457.8 million of CAC common stock; (iii) the use of proceeds from the rights offering by CAC to purchase 100% of the voting units of CGP; (iv) CGP's use of proceeds received from CAC to purchase from CEOC the Planet Hollywood casino property, the Baltimore Horseshoe casino property, and a 50% interest in the management fee revenues of the entities that manage those two properties; and (v) the contribution of CIE common stock from a subsidiary of CEC, along with certain notes held by the subsidiary, in exchange for all of CGP's non-voting units. Id. at 7-8.

40.     Additionally, as part of CEOC's transfer of 50% of its management fees, CEOC, CGP, and CAC entered into a management services agreement (the "2013 Management Services Agreement") intended to "allow[] CAC, [CGP] and their subsidiaries to leverage Caesars'

infrastructure."   CEC Current Report (Form 8-K) (filed Oct. 22, 2013), at 5.   In practice,

however, the 2013 Management Services Agreement operated to give CGP and CAC access to,

and benefit from, the Total Rewards Program while requiring CEOC to perform certain services

on behalf of CGP and CAC.   In exchange, CEOC receives a "service fee."   <u>See</u> 2013

Management Services Agreement § 5.01 (Exhibit 3).

41.   Among other features, the 2013 Management Services Agreement provides that

(i) CEOC has no ability to terminate the agreement (absent an event of default); (ii) CGP and

CAC can unilaterally terminate the agreement on 180 days' notice; (iii) the agreement otherwise

remains in effect until CGP is liquidated; and (iv) if the agreement is terminated, CEOC must

provide "transition assistance" upon termination.   <u>See</u> 2013 Management Services Agreement

§§ 3.04(b), 10.01, 10.03.   Upon information and belief, and in light of its one-sided nature, the

2013 Management Services Agreement was not negotiated on an arms' length basis or in good

faith.

**Four Properties Transactions**

42.   On March 1, 2014, CEC caused CEOC to enter into a transaction agreement that

required CEOC's subsidiaries to sell four of its most valuable properties to CGP (the "<u>2014</u>

<u>Transaction Agreement</u>").   <u>See</u> Mem. in Support, at 34.   The properties included the Linq Hotel,

The Cromwell, Bally's Las Vegas, and Harrah's New Orleans, as well as 50% of the

management fees CEOC would earn from managing each of these properties.   <u>See id.</u>   The Linq

Hotel, The Cromwell, and Bally's Las Vegas are among Caesars' most valuable and newly

renovated properties in Las Vegas.   In fact, The Cromwell was extensively renovated,

redeveloped, and only reopened in May 2014.   The Linq Hotel recently underwent substantial

renovation that was completed in July 2015.   Bally's Las Vegas had a new tower open in the

fourth quarter of 2013.  Additionally, Harrah's New Orleans is the largest casino in Louisiana and enjoys a significant share of the New Orleans gaming market.

43.     The Linq Hotel, for example, is so valuable that CGP has openly acknowledged that its construction (along with Project LINQ) caused a material decline in Caesars' revenue in 2013.  See CEC Current Report (Form 8-K) (filed Apr. 10, 2014), at 26.  Similarly, according to CAC, CGP's increase in room revenues for the third quarter in 2014 was driven by the renovated tower at Bally's Las Vegas and the opening of The Cromwell.  See CAC Quarterly Report (Form 10-Q) (filed Nov. 14, 2014), at 41.

44.     CEOC received roughly $2 billion ($1.8 billion of cash and CGP's assumption of a $185 million credit facility used to renovate The Cromwell) in exchange for transferring these four properties to CGP.  See Mem. in Support, at 34.  This amount, however, is likely understated because (i) CEOC agreed to pay cost overruns for renovations on the Linq Hotel and certain other expenses; (ii) funds required to pay the remaining costs for The Cromwell renovation were transferred by CEOC to CGP; and (iii) the consideration does not take into account the value of these properties to the Caesars enterprise as a whole.  See 2014 Transaction Agreement § 11.2(g) (Exhibit 4).

45.     For example, Caesars consistently emphasizes the value that the Total Rewards Program generates by funneling customers from its regional properties to its marquee properties, such as those in Las Vegas and New Orleans.  According to CEC, Total Rewards allows it to generate almost one-third more revenue than its competitors.  Pursuant to the Distressed Transfers, however, many of Caesars' marquee properties were transferred from CEOC and its subsidiaries to CEC subsidiaries.  As a result, while CEOC and its subsidiaries (who now own mostly regional properties) generate customers for the marquee properties, they do not share in

revenue generated by customers at the marquee locations.  Thus, as a result of the Distressed

Transfers, CEOC and its subsidiaries—and their substantial creditors, including the 10.75%

Notes Trustee—were not only provided with insignificant value for the properties that were

transferred, but were also robbed of the increased revenue generated at those properties by

operation of the Total Rewards Program.

**CES Transaction**

46.     The 2014 Transaction Agreement also established a joint services venture, CES,

that assumed control over certain of CEOC's intellectual property, including the Total Rewards

Program.  CES is owned, in part, by CEOC, CERP, and CGP.  Moreover, CES may have been

created to move the Total Rewards Program out of the reach of CEOC creditors.  Upon

information and belief, a CAC management call on March 27, 2014 described CES as being

"bankruptcy remote" and intended to protect assets from a bankruptcy filing by one of its

owners.  Additionally, at a regulatory hearing in Louisiana on April 24, 2014, CAC's general

counsel admitted that CES was formed at the request of CAC's special committee based on "a

fear o[f] the Caesars Acquisition Company that parties might take away the Total Rewards

Program from Caesars Acquisition Company, and these CEOC lenders, who -- we don't know

what their intentions are."  Louisiana Gaming Control Board Directors' Meeting Transcript, at

136:19-136:24 (Apr. 24, 2014) (Exhibit 5).

47.     On May 20, 2014, CEOC, CERP, and CGP entered into the Omnibus License and

Enterprise Services Agreement (as amended and restated, the "License Agreement").  The

License Agreement provides for CEOC's grant to CES of a non-exclusive, irrevocable, world-

wide, royalty free license for all intellectual property, including the Total Rewards Program.  See

CAC Current Report (Form 8-K) (filed May 21, 2014), at 3. Additionally, the agreement transitions certain "enterprise-wide" corporate services to CES.

48.     This arrangement gave disproportionate control over key functions to CES. This control is compounded by the fact that CES is meant to serve the interests of CERP and CGP prior to serving the interests of CEOC. See CEC Current Report (Form 8-K) (filed May 6, 2014), at Risk Factors ("In the event that our interests do not align with those of [CGP] or CERP, the interests of [CGP] or CERP may be met before ours."). Though CEOC received a 69% stake in CES for the grant of its intellectual property and other consideration, this interest cannot be sold or assigned to third parties. See License Agreement § 16.4. CEOC is also responsible for 70% of the costs attributed to CES (compared to 24.6% for CERP and 5.4% for CGP). Accordingly, this all served to move Caesars' arguably most valuable asset, the Total Rewards Program, to an entity controlled by CERP and CGP, while shifting costs onto CEOC and depriving CEOC of value to service its obligations under the Indenture.

**The Purported Parent Guarantee Strip**

49.     On May 6, 2014, CEC announced that the Parent Guarantee was released as to CEOC's secured and unsecured debt as a result of certain transactions consisting of (i) a $1.75 billion "refinancing" of CEOC's credit facility (the "B-7 Financing") and (ii) CEC's sale of 68.1 shares, or just five percent (5%), of CEOC's common stock for the nominal sum of $6.15 million (the "Five Percent Sale"). See CEC Current Report (Form 8-K) (filed May 6, 2014), at 5-6. Subsequently, on May 30, 2014, CEC transferred another six percent (6%) of CEOC's common stock to an employee benefits plan (the "Six Percent Transfer" and, together with the B-7 Financing and the Five Percent Sale, the "May Transactions").

19

50.     Following the Five Percent Sale (and prior to the Six Percent Transfer), CEC and CEOC publicly disclaimed the Parent Guarantee by each filing a Form 8-K (together, the "May Announcement") stating that, pursuant to the Five Percent Sale, the Parent Guarantee was automatically released as to all of CEOC's outstanding secured and unsecured notes (including the 10.75% Notes).  See CEC Current Report (Form 8-K) (filed May 6, 2014), at 6 ("Upon the completion of the [Five Percent Sale], [CEC]'s guarantee of CEOC's outstanding secured and unsecured notes was automatically released."); CEOC Current Report (Form 8-K) (filed May 6, 2014) (same).  CEC and CEOC provided no further indication as to why the Five Percent Sale was undertaken or how the transaction provided any value to CEC or CEOC.

51.     Upon information and belief, the Five Percent Sale was an attempt to avoid payments by CEC of principal and interest under CEOC's secured and unsecured notes, including the 10.75% Notes, rather than a *bona fide* sale transaction.  The investors that purchased CEOC's equity in the Five Percent Sale were reportedly holders of other debt or equity in the Caesars capital structure, including First Lien Bank Debt and/or CEC equity.  Upon information and belief, the purchasing parties benefitted from termination of the Parent Guarantee because (i) holders of First Lien Bank Debt would not have to share any value to be received from CEC with the holders of CEOC's secured or unsecured notes and (ii) removal of the Parent Guarantee would create equity value for CEC shareholders.

52.     Pursuant to the Indenture, the Five Percent Sale was insufficient to terminate the Parent Guarantee.  The Indenture unambiguously provides that CEOC ceasing to be a wholly owned subsidiary of CEC is one of three total conditions that all must be met in order for the Parent Guarantee to be automatically released:

(c) A Note Guarantee as to any Parent Note Guarantor shall terminate and be of no further force or effect and such Note Guarantor shall be deemed to be released from all obligations under this Article 11 upon:

(i) the Issuer ceasing to be a Wholly Owned Subsidiary of Harrah's Entertainment;

(ii) the Issuer's transfer of all or substantially all of its assets to, or merger with, an entity that is not a Wholly Owned Subsidiary of Harrah's Entertainment in accordance with Section 5.01 and such transferee entity assumes the Issuer's obligations under this Indenture; *and*

(iii) the Issuer's exercise of its legal defeasance option or covenant defeasance option under Article 8 or if the Issuer's obligations under this Indenture are discharged in accordance with the terms of this Indenture.

Indenture § 11.02(c) (emphasis added).  These conditions are conjunctive (as the conditions are connected by the word "and") and each condition, therefore, must be met in order for the Parent Guarantee to be released.  All of the conditions in Section 11.02(c) were not satisfied at the time of the disavowal of the Parent Guarantee (and CEC and CEOC have not claimed otherwise).  Accordingly, the Parent Guarantee could not have been released from the 10.75% Notes pursuant to this section as a result of the Five Percent Sale.  Because the Parent Guarantee was not released pursuant to the Five Percent Sale, CEC's disavowal of the Parent Guarantee in the May Announcement on May 6, 2014 constituted a material default that became an Event of Default on May 16, 2014 when it remained continuing and uncured.  See Indenture § 6.01(h).

53.     CEOC and CEC have implicitly recognized that default.  Several weeks after the Five Percent Sale, CEOC undertook the Six Percent Transfer, which transferred six percent of CEOC's common stock to an employee benefits program.  As a result of this transaction, CEC reduced its holdings to 89% of CEOC's equity.  Again, CEC and CEOC provided no indication that this was a *bona fide* sale transaction and, upon information and belief, the transaction was undertaken for the sole purpose of justifying CEC's prior material breach of the Indenture.

54.     Following the May Transactions, on June 2, 2014, CEOC sent a notice to the 10.75% Notes Trustee (the "10.75% Subsequent Notice") and separate notices (the "Secured June Notices" and, together with the 10.75% Subsequent Notice, the "June Notices") to the indenture trustees for the Secured Notes purporting to release the Parent Guarantee in accordance with a separate Indenture provision.  The June Notices also reiterated that the May Transactions caused the automatic release of the Parent Guarantee from the 10.75% Notes and the Secured Notes.  In any event, both the Six Percent Transfer and the June Notices, undertaken at a time when CEC was in material breach of the Indenture, are of no force or effect.

55.     CEC's scheme to remove valuable assets from CEOC and to remove the Parent Guarantee from CEOC's debt, including the 10.75% Notes, is subject to several lawsuits currently pending, including:

- Actions filed by certain holders of the Legacy Notes in the Southern District of New York, MeehanCombs Glob. Credit Opportunities Master Fund, LP v. Caesars Entm't Corp., No. 14-cv-07091 (SAS) (S.D.N.Y. 2014) and Danner v. Caesars Entm't Corp., No. 14-cv-07093 (SAS) (S.D.N.Y. 2014) (together, the "MeehanCombs Action");

- An action filed by CEC and CEOC in the Supreme Court of New York, New York County against certain holders of First Lien Notes and Second Lien Notes, Caesars Entm't Operating Co., Inc. v. Appaloosa Inv. Ltd. P'ship I, et al., Index No. 652392/2014 (N.Y. Sup. Ct. 2014);

- An action filed by the indenture trustee for the 10% Second Lien Notes in the Delaware Chancery Court, Wilmington Sav. Fund Society, FSB v. Caesars Entm't Corp., No. 10004-VCG (Del. Ch. 2014) (the "WSFS Action");

- An action filed by the trustee for the First Lien Notes in the Delaware Chancery Court, UMB Bank v. Caesars Entm't Corp., No. 10393-VCG (Del. Ch. 2014);

- An action filed by the trustee for the 12.75% Second Lien Notes in the Southern District of New York, BOKF, N.A. v. Caesars Entm't Corp., No. 1:15-cv-01561 (SAS) (S.D.N.Y. 2015) (the "BOKF Action"); and

- An action filed by the trustee for the First Lien Notes in the Southern District of New York, UMB Bank, N.A. v. Caesars Entm't Corp., No. l:15-cv-04634 (SAS) (S.D.N.Y. 2015) (the "UMB Action").

56.     The actions filed in the Southern District of New York are consolidated before Judge Shira A. Scheindlin and are proceeding with discovery.   On August 27, 2015, Judge Scheindlin issued the TIA Decision, denying the plaintiffs' motion for summary judgment in the BOKF Action and UMB Action but holding that CEC's release of the Parent Guarantee would constitute a violation of the TIA to the extent it was part of an out-of-court restructuring or reorganization.   See TIA Decision, at 31-32 (denying summary judgment but recognizing the need to "examin[e] the transactions as a whole to determine whether they *collectively* constitute an impermissible out-of-court reorganization in violation of the noteholders' rights under section 316(b) . . .") (emphasis in original).

## COUNT I

### BREACH OF INDENTURE
### (Indenture § 6.01(h) – Disavowal of Parent Guarantee Pursuant to the May Announcement)

57.     The 10.75% Notes Trustee restates and realleges the allegations contained in paragraphs 1 through 56 above, as if fully set forth herein.

58.     The terms of the Indenture were at all relevant times valid and enforceable contract obligations of CEC and CEOC to the 10.75% Notes Trustee and the 10.75% Noteholders.

59.     CEC provided the Parent Guarantee as a material term of the Indenture regarding the repayment of principal and interest.

60.     Section 6.01(h) of the Indenture provides that an Event of Default occurs if the "Parent Note Guarantor . . . denies or disaffirms its obligations under this Indenture or any Note Guarantee with respect to such series of Notes and such Default continues for 10 days." Indenture § 6.01(h).

61.     The May Announcement by CEC that the Parent Guarantee had been "automatically released" constitutes a denial or disaffirmance of obligations under the Indenture to pay principal and interest when due and such default continued for more than 10 days.  An Event of Default under the Indenture has, therefore, occurred and is continuing.

62.     This breach of the Indenture harmed the 10.75% Notes Trustee and the 10.75% Noteholders.

## COUNT II

## VIOLATIONS OF TRUST INDENTURE ACT – FIVE PERCENT SALE
(15 U.S.C. §§ 77aaa, *et seq.*)

63.     The 10.75% Notes Trustee restates and realleges the allegations contained in paragraphs 1 through 62 above, as if fully set forth herein.

64.     The terms of the Indenture were at all relevant times valid and enforceable contract obligations of CEC and CEOC to the 10.75% Notes Trustee and the 10.75% Noteholders.  The Indenture specifically provides that CEC has a direct obligation to pay principal and interest when due under the Indenture.

65.     Upon information and belief, at the time of the Missed Interest Payments, CEOC, as issuer of the 10.75% Notes, was insolvent.

66.     The TIA governs corporate debt securities offered for sale that have been qualified by the Securities and Exchange Commission, including the 10.75% Notes.  In order to qualify under the TIA, the relevant indenture must contain specific provisions designed to protect the bondholder.  See 15 U.S.C. § 77ggg.

67.     Section 316(b) of the TIA requires that the 10.75% Notes Trustee and the 10.75% Noteholders have an absolute right to receive payment of the principal of and interest under the Indenture and further provides that the 10.75% Notes Trustee's and the 10.75% Noteholders'

right to institute suit for the enforcement of any such payment shall not be impaired or affected without their consent.  See id. § 77ppp(b).

68.     Contrary to this statutory mandate, CEC has impaired and affected the 10.75% Noteholders' right to receive payment of principal and interest when due without the consent of each 10.75% Noteholder.  CEC's attempt to terminate or release the Parent Guarantee pursuant to the Five Percent Sale was part of a broader restructuring or reorganization scheme to protect CEC and its affiliates' interests at the expense of the 10.75% Notes Trustee and the 10.75% Noteholders, as well as other CEOC creditors.  This out-of-court restructuring or reorganization, which impaired the 10.75% Noteholders' rights to obtain payment of interest on the 10.75% Notes without the consent of each 10.75% Noteholder, directly violated the provisions of the TIA.

69.     The purported elimination of the Parent Guarantee prospectively impairs the rights of the 10.75% Notes Trustee and the 10.75% Noteholders to receive payment of principal and interest on and when due.

70.     Accordingly, the 10.75% Notes Trustee seeks a declaration that the Five Percent Sale did not effectuate a release of the Parent Guarantee as such action violated the TIA.

71.     As a result of CEC's violations of the TIA, the 10.75% Notes Trustee and the 10.75% Noteholders have suffered actual and prospective damages in an amount to be determined at trial.

## COUNT III

### VIOLATIONS OF TRUST INDENTURE ACT – 10.75% SUBSEQUENT NOTICE
### (15 U.S.C. §§ 77aaa, et seq.)

72.     The 10.75% Notes Trustee restates and realleges the allegations contained in paragraphs 1 through 71 above, as if fully set forth herein.

73.     The terms of the Indenture were at all relevant times valid and enforceable contract obligations of CEC and CEOC to the 10.75% Notes Trustee and the 10.75% Noteholders. The Indenture specifically provides that CEC has a direct obligation to pay principal and interest when due under the Indenture.

74.     Upon information and belief, at the time of the Missed Interest Payments, CEOC, as issuer of the 10.75% Notes, was insolvent.

75.     The TIA governs corporate debt securities offered for sale that have been qualified by the Securities and Exchange Commission, including the 10.75% Notes.  In order to qualify under the TIA, the relevant indenture must contain specific provisions designed to protect the bondholder.  See 15 U.S.C. § 77ggg.

76.     Section 316(b) of the TIA requires that the 10.75% Notes Trustee and the 10.75% Noteholders have an absolute right to receive payment of the principal of and interest under the Indenture and further provides that the 10.75% Notes Trustee's and the 10.75% Noteholders' right to institute suit for the enforcement of any such payment shall not be impaired or affected without their consent.  See id. § 77ppp(b).

77.     Contrary to this statutory mandate, CEC has impaired and affected the 10.75% Noteholders' right to receive payment of principal and interest when due without the consent of each 10.75% Noteholder.  CEC's attempt to terminate or release the Parent Guarantee pursuant to the June Notices, including the 10.75% Subsequent Notice, was part of a broader restructuring or reorganization scheme to protect CEC and its affiliates' interests at the expense of the 10.75% Notes Trustee and the 10.75% Noteholders, as well as other CEOC creditors.  This out-of-court restructuring or reorganization, which impaired the 10.75% Noteholders' rights to obtain

payment of interest on the 10.75% Notes pursuant to the Parent Guarantee without the consent of each 10.75% Noteholder, directly violated the provisions of the TIA.

78.     The purported elimination of the Parent Guarantee prospectively impairs the rights of the 10.75% Notes Trustee and the 10.75% Noteholders to receive payment of principal and interest on and when due.

79.     Accordingly, the 10.75% Notes Trustee seeks a declaration that the 10.75% Subsequent Notice did not effectuate a release of the Parent Guarantee as such action violated the TIA.

80.     As a result of CEC's violations of the TIA, the 10.75% Notes Trustee and the 10.75% Noteholders have suffered actual and prospective damages in an amount to be determined at trial.

**COUNT IV**

**DECLARATORY JUDGMENT**
**(Affirming Parent Guarantee)**

81.     The 10.75% Notes Trustee restates and realleges the allegations contained in paragraphs 1 through 80 above, as if fully set forth herein.

82.     An actual controversy exists between the 10.75% Notes Trustee and CEC regarding the validity and enforceability of the Parent Guarantee of the 10.75% Notes under the Indenture.

83.     The Parent Guarantee remains valid and binding on CEC because:

- The 10.75% Notes Trustee's and the 10.75% Noteholders' right to receive payment of principal and interest from CEC cannot be impaired pursuant to an out-of-court restructuring or reorganization without the consent of each 10.75% Noteholder, regardless of whether purportedly permitted by the Indenture;

- CEOC still constitutes a wholly owned subsidiary of CEC notwithstanding the Five Percent Sale and the Six Percent Transfer and, therefore, the Parent

Guarantee has not been released pursuant to Sections 11.02(c)(i)-(iii) of the Indenture;

- Even if CEOC were no longer a wholly owned subsidiary of CEC, the other conditions in Sections 11.02(c)(ii) and (c)(iii) of the Indenture have not been met as required to release the Parent Guarantee;

- Even if CEOC were no longer a wholly owned subsidiary of CEC, the Five Percent Sale and Six Percent Transfer were part of an out-of-court restructuring or reorganization scheme to release the Parent Guarantee to the detriment of the 10.75% Notes Trustee and the 10.75% Noteholders; and

- The 10.75% Subsequent Notice failed to affect CEC's earlier material, uncured breach of the Indenture as a result of its disavowal of the Parent Guarantee.

84.    CEC's attempts to restructure its liability on the Parent Guarantee violate Section 316(b) of the TIA, because the right to receive payment of principal and interest under the Indenture cannot be impaired without the consent of each 10.75% Noteholder.  To the extent the TIA conflicts with any provision in the Indenture (such as the provisions governing the release of the Parent Guarantee), pursuant to Section 13.01 of the Indenture, the TIA controls.  For this reason, the release of the Parent Guarantee under Section 11.02 of the Indenture—to the extent valid, which it is not—would conflict with Section 316(b) of the TIA.  Section 11.02 of the Indenture is, therefore, void and unenforceable in this context.

85.    Accordingly, the 10.75% Notes Trustee is entitled to a declaration that the Parent Guarantee under the Indenture has not been terminated or released and remains valid, binding, and enforceable against CEC pursuant to the express provisions of the Indenture.

## COUNT V

### BREACH OF INDENTURE
### (Indenture § 6.07 – Deprivation of Unconditional Right to Receive Principal and Interest Payments Without Consent of Each Affected Noteholder)

86.    The 10.75% Notes Trustee restates and realleges the allegations contained in paragraphs 1 through 85 above, as if fully set forth herein.

87.    The terms of the Indenture were at all relevant times valid and enforceable contract obligations of CEC and CEOC to the 10.75% Notes Trustee and the 10.75% Noteholders.

88.    Under Section 6.07 of the Indenture (mandated by Section 316(b) of the TIA), the 10.75% Notes Trustee and the 10.75% Noteholders are entitled to the unconditional right to receive principal and interest payments from CEOC and CEC.  Such right shall not be impaired without the consent of each individual holder of the 10.75% Notes.

89.    CEC has impaired the rights of the 10.75% Notes Trustee and the 10.75% Noteholders to the payment of principal and interest, including the Missed Interest Payments, under the 10.75% Notes, without securing the consent of each 10.75% Noteholder.

90.    Accordingly, the 10.75% Notes Trustee is entitled to the declaratory relief pleaded in Count IV above.

91.    In addition, as a result of CEC's breach, the 10.75% Notes Trustee and the 10.75% Noteholders have suffered substantial actual and prospective damages in an amount to be determined at trial, including, but not limited to, all outstanding accrued, unpaid, and capitalized interest on the 10.75% Notes and all other amounts and obligations due and owing under the Indenture.

92.    Pursuant to Section 11.01(j) of the Indenture, this Court should additionally award attorneys' fees and expenses incurred by the 10.75% Notes Trustee and any 10.75% Noteholder in enforcing the Parent Guarantee.

## COUNT VI

**BREACH OF INDENTURE**
**(Indenture § 6.01(a) – Failure to Pay Interest When Due)**

93.     The 10.75% Notes Trustee restates and realleges the allegations contained in paragraphs 1 through 92 above, as if fully set forth herein.

94.     The terms of the Indenture were at all relevant times valid and enforceable contract obligations of CEC and CEOC to the 10.75% Notes Trustee and the 10.75% Noteholders.

95.     CEC provided the Parent Guarantee under the Indenture.

96.     Section 6.01(a) of the Indenture provides that an Event of Default occurs if "there is a default in any payment of interest (including any additional interest) on any Note of such series when the same becomes due and payable, and such default continues for a period of 30 days."  Indenture § 6.01(a).

97.     Section 11.01(a) of the Indenture provides that CEC is a primary obligor that has "jointly and severally, irrevocably and unconditionally" guaranteed the payment of interest under the Indenture when due and payable.  Id. § 11.01(a).

98.     Interest payments in the aggregate amount of $51,447,565.00 were due and payable under the Indenture on February 1 and August 1, 2015.  See Form Of Reverse Side Of Initial Cash Pay Note for the 10.75% Senior Cash Pay Notes Due 2016.  CEC has failed to pay the outstanding interest that was due and payable on February 1 and August 1, 2015.  An Event of Default under Section 6.01(a) of the Indenture has, therefore, occurred and is continuing and CEC has not fulfilled its obligations under the Indenture.

99.     Section 6.08 of the Indenture provides that if an Event of Default specified in Section 6.01(a) occurs and is continuing, the 10.75% Notes Trustee may recover a judgment in

its own name and as trustee of an express trust against the Issuer or any other obligor on the 10.75% Notes for the whole amount then due and owing (together with interest on overdue principal and any unpaid interest at the rate provided for in the Notes) and amounts owed under the compensation and indemnity provisions of Section 7.07 of the Indenture.

100.    This breach of the Indenture harmed the 10.75% Notes Trustee and the 10.75% Noteholders.

## COUNT VII

### BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

101.    The 10.75% Notes Trustee restates and realleges the allegations contained in paragraphs 1 through 100 above, as if fully set forth herein.

102.    New York law implies in every contract a covenant requiring each party to deal fairly and in good faith with the other and to refrain from taking any actions that would deprive the other party of the benefit of their respective bargain.

103.    The Indenture is a contract governed by New York law.

104.    CEC has breached its implied duty of good faith and fair dealing by engaging in the transactions as a means to avoid the Parent Guarantee.  CEC's actions have deprived the 10.75% Notes Trustee and the 10.75% Noteholders of their reasonable expectations of receiving the benefits to which they are entitled under the Indenture.

105.    Additionally, CEC breached the covenant of good faith and fair dealing by engaging in a course of conduct outside of performance of the contract, including entry into agreements and amendments that sought to accomplish certain outcomes CEC would never have been able to achieve had it followed the terms of the 10.75% Notes, the Indenture, and the provisions of the TIA.

106.    This breach of the Indenture harmed the 10.75% Notes Trustee and the 10.75%

Noteholders.

## PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, Plaintiff requests that the Court enter an

order:

        a)      Awarding Plaintiff damages in an amount to be determined at trial;

        b)      Declaring that the Parent Guarantee is in full force and effect;

        c)      Awarding pre- and post-judgment interest calculated pursuant to the terms of
                  the 10.75% Notes, the Indenture, and the Parent Guarantee;

        d)      Awarding Plaintiff its attorneys' fees, costs, and expenses incurred in bringing
                  this action; and

        e)      Awarding such other and further relief as the Court may deem proper.

             Plaintiff hereby demands a trial by jury.

Dated: October 20, 2015
New York, New York

                              WHITE & CASE LLP

                              By:  */s/ J. Christopher Shore*
                              J. Christopher Shore
                              Harrison L. Denman
                              Jason Zachary Goldstein
                              White & Case LLP
                              1155 Avenue of the Americas
                              New York, NY 10036
                              Telephone:  (212) 819-8200
                              Facsimile:   (212) 354-8113

                                  -and-

                              Thomas E Lauria
                              Jason Zakia
                              White & Case LLP
                              Southeast Financial Center, Suite 4900
                              200 South Biscayne Blvd.

Miami, FL 33131
Telephone:  (305) 371-2700
Facsimile:   (305) 358-5744

-and-

PRYOR CASHMAN LLP

Seth H. Lieberman
Patrick Sibley
Pryor Cashman LLP
7 Times Square
New York, NY 10036
Telephone: (212) 421-4100
Facsimile:   (212) 326-0806

*Attorneys for Wilmington Trust, National
Association, as successor Indenture Trustee*